```
UNITED STATES DISTRICT COURT
      DISTRICT OF MINNESOTA
```

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 12-CR-0013 (PJS/TNL) |
| Plaintiff, | |
| v. | ORDER |
| DONTE MCKINLEY HOLLISTER, | |
| Defendant. | |

Kevin S. Ueland, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Caroline Durham, OFFICE OF THE FEDERAL DEFENDER, for defendant.

Defendant Donte Hollister is charged with four counts of interference with commerce in violation of the Hobbs Act and one count of armed bank robbery. This matter is before the Court on the parties' objections to Magistrate Judge Tony N. Leung's July 23, 2012 Report and Recommendation ("R&R"). Judge Leung recommends granting in part and denying in part Hollister's motions to suppress evidence. Based on a de novo review, *see* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3), the Court overrules the objections and adopts the R&R.

Hollister seeks to suppress evidence obtained from multiple searches and seizures as well as from two custodial interrogations. Hollister also seeks to suppress various eyewitness identifications of him using photo lineups. The relevant facts are set forth in the R&R and need not be repeated here. The Court addresses each of the parties' objections in turn.

### A. The Government's Objections

The government objects to Judge Leung's recommendations that the Court suppress (1) four bags of clothing that were seized from the home of Hollister's aunt and (2) Hollister's November 2, 2011 statement to a Roseville police officer at the Hennepin County jail.[1]

### 1. Bags of Clothing

Judge Leung recommends suppressing four bags of Hollister's clothing that were found during a search of a house rented and occupied by L.M., who is Hollister's aunt.[2] The testimony at the hearing established that Hollister had been staying at L.M.'s house "for just a couple of days because he recently had been kicked out of his girlfriend's place in Brooklyn Center." Hr'g Tr. 115, May 29, 2012 [ECF No. 48]. On October 19, 2011, police arrested Hollister outside L.M.'s house. Hr'g Tr. 111-14. L.M. then consented to a search of the house. Hr'g Tr. 114-15; Gov't Ex. 2 (signed consent form). During the search, L.M. pointed out the room where

---

[1]The government does not object to Judge Leung's recommendation that Hollister's October 19, 2011 statement be suppressed from the point that Hollister told the officers to call his mother so that she could call his attorney. *See* ECF No. 58 at 14 n.2. The Court accordingly adopts that recommendation.

[2]The Court notes that Judge Leung did not recommend suppressing a black hooded sweatshirt that was found in the closet of Hollister's room. *See* Gov't Ex. 2 at 2 (inventory of items found in the house). Hollister does not mention the sweatshirt in his objections and, as discussed below, the Court has no trouble concluding that L.M. had authority to consent to the search of the room and the closet. Witnesses and surveillance video of the robberies indicated that the robber wore a dark hooded sweatshirt, *see* Hr'g Tr. 40, 110, May 29, 2012 [ECF No. 48], and thus the incriminating nature of the sweatshirt would have been immediately apparent, which means that officers could seize the sweatshirt under the plain-view exception to the warrant requirement. *See United States v. Armstrong*, 554 F.3d 1159, 1162-63 (8th Cir. 2009) (incriminating character of evidence is "immediately apparent" if there is probable cause to associate the property with criminal activity).

Hollister kept his personal belongings.³ Hr'g Tr. 116. There were "a bunch of white garbage bags containing his personal clothing." Hr'g Tr. 116. L.M. told officers to take the bags because she "wanted them out of the house" and "didn't want anything to do with them." Hr'g Tr. 116.

Judge Leung recommends suppressing the contents of the bags because "officers could not reasonably assume that L.M. had authority to consent to the opening of the four bags." R&R at 35. In its objection, the government argues that L.M. had authority to consent to the *seizure* of the bags, relying mainly on *United States v. Wiest*, 596 F.3d 906 (8th Cir. 2010). But whether L.M. had authority to consent to the *seizure* of the bags is not the issue; the issue is whether L.M. had authority to consent to a *search* of the bags.⁴ As the Eighth Circuit has recently observed, courts must be careful to distinguish between searches and seizures:

> "Although our Fourth Amendment cases sometimes refer indiscriminately to searches and seizures, there are important differences between the two . . . . The Amendment protects two different interests of the citizen — the interest in retaining possession of property and the interest in maintaining personal privacy. A seizure threatens the former, a search the latter. As a matter of timing, a seizure is usually preceded by a search, but when a container is involved the converse is often true. Significantly, the two protected interests are not always present to the same extent; for example, the seizure of a locked suitcase does not necessarily compromise the secrecy of its contents, and the

---

³L.M.'s boyfriend and Hollister's cousin were also present during the search. Hr'g Tr. 115-16. The record is unclear concerning exactly who pointed out Hollister's room and told police to take his bags. For purposes of this motion, the Court will assume that it was L.M.

⁴The government does not contend that the police obtained a warrant to search Hollister's bags. Nor does the government contend that the contents of the bags were in plain view, or that any other exception to the warrant requirement (save consent) is at issue. (Indeed, as Judge Leung observed, there is no evidence concerning how the government discovered the contents of the bags. R&R at 35.) The only possible conclusion, therefore, is that the police searched the bags, and the only possible source of authority for that search would be the consent of L.M.

> search of a stopped vehicle does not necessarily deprive its owner
> of possession."

*United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012) (quoting *Texas v. Brown*, 460 U.S. 730, 747-48 (1983) (Stevens, J., concurring)).

Thus, police may have the authority to conduct a warrantless seizure of a container without necessarily having the authority to conduct a warrantless search of that container. *See United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package."); *United States v. Place*, 462 U.S. 696, 701 (1983) ("Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.").

Consent to search "may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the item to be searched." *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003). Whether there is common authority is a question of fact and is determined by mutual use, joint access, and control. *Id.* Authority to consent to a search may be either actual or apparent. *Id.* at 615. The government does not contend that L.M. had apparent authority to consent to the search of Hollister's bags, probably because there is no

dispute that officers knew that the bags belonged to Hollister and not L.M. The only question, then, is whether L.M. had actual authority to consent to the search.

The Court has no doubt that L.M. had authority to consent to the search of the entire premises, including the room in which Hollister had been staying. The evidence establishes that L.M. was the rent-paying tenant of the house and that Hollister was an overnight guest of only a few days' duration. But the authority to consent to a search of the *premises* does not necessarily include the authority to consent to the search of all *containers* within the premises. *See Georgia v. Randolph*, 547 U.S. 103, 112 (2006) ("when it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent"); *United States v. Munoz*, 590 F.3d 916, 922-23 (8th Cir. 2010) (third party's consent to search a car did not authorize search of defendant's backpack that was located in the car); *United States v. Almeida-Perez*, 549 F.3d 1162, 1172 (8th Cir. 2008) (noting that there may be cases in which police might have "reason to know the area or container was off-limits to the consenting spouse"); *James*, 353 F.3d at 614-15 (holding that friend to whom defendant had sent his computer discs for storage did not have authority to consent to search of the discs); *Smith v. Heimer*, 35 Fed. Appx. 293, 294-95 (8th Cir. 2002) (per curiam) (no qualified immunity for officers' search of locked safe even though third party had consented to search of house); *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) (mother did not have authority to consent to search of locked footlocker in adult son's room (cited in *James*, 353 F.3d at 613 n.2)).

In this case, L.M. expressly informed police that the bags belonged to Hollister. Hr'g Tr. 116, 130. There is no evidence that L.M. or anyone else had joint use or control over the

bags. Given the undisputed facts, the Court cannot find that L.M. had authority to consent to a search of the bags. The contents of the bags must therefore be suppressed. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (government bears the burden of establishing common authority).

2. November 2, 2011 Statement

Hollister was arrested on October 19, 2011 and, after being given *Miranda* warnings, responded to police questioning for over 20 minutes before invoking his right to counsel. On November 2, after giving Hollister a second set of *Miranda* warnings, an officer from a different police department questioned Hollister about a different robbery. Judge Leung recommends suppressing all of Hollister's November 2 statements under *Edwards v. Arizona*, 451 U.S. 477 (1981). The government objects to Judge Leung's recommendation.

Before beginning the analysis, it is important to identify what is *not* in dispute. The government does not dispute that Hollister was "in custody" for *Miranda* purposes during both the October 19 and the November 2 interviews.[5] *Cf. Howes v. Fields*, 132 S. Ct. 1181, 1189

---

[5]The Court notes that, in its objection, the government incorporated the memorandum that it submitted to Judge Leung. ECF No. 58 at 2 n.1. In that memorandum, however, the government barely addressed the admissibility of Hollister's statements. The sum total of the government's argument in that document is as follows: "Indeed, the defendant's challenges to the statements can be decided solely based on the Court's review of the recorded interviews (Government Exhibits 5 and 6)." ECF No. 52 at 5. At no time has the government explicitly argued that Hollister was not in custody during his interrogations, and merely reviewing a recorded interview would not necessarily give the Court a sufficient basis to make a determination on that issue. The Court therefore does not understand the government to be contesting that Hollister was in *Miranda* custody when he was interrogated.

The government also declares that it preserves "all possible arguments supporting the admissibility of defendant's statements." ECF No. 58 at 2 n.1. But the only way that the government can preserve an argument is to *make* it. An argument that is not explicitly made by
(continued...)

(2012) (a prisoner who is taken aside and questioned about events outside prison walls is not necessarily "in custody" for purposes of *Miranda*); *United States v. Ellison*, 632 F.3d 727, 730 (1st Cir. 2010) (Souter, J.) (pretrial detainee was not in custody when he was interviewed in jail library). The government also does not dispute that Hollister was subject to interrogation during both of those encounters. *Cf. United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) ("The *Miranda* protections are triggered only when a defendant is both in custody and being interrogated."). Likewise, the government does not dispute that Hollister invoked his right to counsel during the October 19 interview or that Hollister was in pretrial detention during the entire interval between the two interviews.[6] Nor does the government contend that Hollister initiated the November 2 interview or that Hollister's counsel was present during that interview. *See Minnick v. Mississippi*, 498 U.S. 146, 153 (1990) (once an accused invokes his right to counsel, police may no longer interrogate him outside of the presence of counsel). Finally, it is irrelevant that the November 2 interview concerned a different crime than the one for which Hollister was being held in pretrial custody or that a different law-enforcement agency was involved in the second interview. *Arizona v. Roberson*, 486 U.S. 675, 677-79 (1988). This would seem, then, to be a paradigmatic case for suppression under *Edwards*, which held that an accused who invokes his right to counsel under *Miranda* "is not subject to further interrogation

---

[5](...continued)
the government — either before the magistrate judge or before this Court — is not "preserved," notwithstanding the government's curious declaration to the contrary.

[6]The parties submitted the issue of the admissibility of Hollister's statements on a stipulated record, which consists of recordings of the two statements. *See* ECF No. 58 at 6. There is thus no evidence concerning Hollister's whereabouts in the interval between the statements. The government does not dispute, however, that Hollister was in pretrial custody the entire time. *See* ECF No. 58 at 11, 14.

by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.

The government nevertheless objects to Judge Leung's recommendation on the strength of *Maryland v. Shatzer*, 130 S. Ct. 1213 (2010). In *Shatzer*, a police officer attempted to interview the defendant, Shatzer, about allegations that he had sexually abused his son. *Id.* at 1217. At the time of the interview, Shatzer was incarcerated pursuant to an unrelated conviction. *Id.* After being advised of his *Miranda* rights, Shatzer declined to speak without an attorney, and the officer ended the interview and closed the investigation. *Id.* Two and a half years later, law enforcement reopened the investigation and interrogated Shatzer a second time. *Id.* at 1217-18. This time, after receiving a *Miranda* warning, Shatzer made incriminating statements. *Id.* at 1218.

The Supreme Court held that Shatzer's statements did not need to be suppressed under *Edwards* because Shatzer had experienced a break in custody of sufficient duration to "dissipate its coercive effects." *Id.* at 1222. In so holding, the Court made two rulings important to this case: First, the Court established a bright-line rule that a 14-day break in custody is sufficient to take a case outside of the *Edwards* rule. *Id.* at 1223. Second, the Court held that a convict's return to the general prison population qualifies as a break in custody. *Id.* at 1224-25.

Based on these rulings, the government argues that Hollister's November 2 statements are admissible. Because Hollister's interrogations were two weeks apart, and because, in the interim, Hollister was "returned to the general population at the Hennepin County Jail," ECF No. 58 at 14, the government contends that Hollister's statements are admissible under *Shatzer*.

The government's argument, however, ignores a crucial distinction between this case and *Shatzer*. Shatzer was not a pretrial detainee; he was a prison inmate serving a sentence of imprisonment pursuant to a conviction. *Shatzer*, 130 S. Ct. at 1224. The Supreme Court explicitly based its holding on this distinction and repeatedly emphasized this distinction. It is worth quoting *Shatzer*'s discussion of this distinction at length, particularly because the government has inexplicably failed even to acknowledge the distinction in its briefing in this case:

> . . . . Without minimizing the harsh realities of incarceration, we think lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*.
>
> Interrogated suspects who have previously been convicted of crime live in prison. When they are released back into the general prison population, they return to their accustomed surroundings and daily routine — they regain the degree of control they had over their lives prior to the interrogation. Sentenced prisoners, in contrast to the *Miranda* paradigm, are not isolated with their accusers. They live among other inmates, guards, and workers, and often can receive visitors and communicate with people on the outside by mail or telephone.
>
> Their detention, moreover, is relatively disconnected from their prior unwillingness to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing. And even where the possibility of parole exists, the former interrogator has no apparent power to decrease the time served. This is in stark contrast to the circumstances faced by the defendants in *Edwards*, *Roberson*, and *Minnick*, whose continued detention as suspects rested with those controlling their interrogation, and who confronted the uncertainties of what final charges they would face, whether they would be convicted, and what sentence they would receive.
>
> Shatzer's experience illustrates the vast differences between *Miranda* custody and incarceration pursuant to conviction. At the

> time of the 2003 attempted interrogation, Shatzer was already serving a sentence for a prior conviction. After that, he returned to the general prison population in the Maryland Correctional Institution-Hagerstown and was later transferred, for unrelated reasons, down the street to the Roxbury Correctional Institute. Both are medium-security state correctional facilities. Inmates in these facilities generally can visit the library each week; have regular exercise and recreation periods; can participate in basic adult education and occupational training; are able to send and receive mail; and are allowed to receive visitors twice a week. His continued detention after the 2003 interrogation did not depend on what he said (or did not say) to Detective Blankenship, and he has not alleged that he was placed in a higher level of security or faced any continuing restraints as a result of the 2003 interrogation. The "inherently compelling pressures" of custodial interrogation ended when he returned to his normal life.

*Shatzer*, 130 S. Ct. at 1224-25 (footnote and internal citations omitted). The basis of the Court's holding could not be clearer: Incarceration pursuant to conviction is significantly different from pretrial detention.

In contrast to Shatzer, Hollister was not serving a sentence of incarceration pursuant to a conviction; he was in pretrial detention. It cannot be said that Hollister's detention was "relatively disconnected from [his] prior unwillingness to cooperate in an investigation." *Id.* Nor can it be said that, when Hollister's initial interrogation was over, Hollister "returned to his normal life." *Id.* at 1225. Instead, like the defendants in *Edwards*, *Roberson*, and *Minnick* — the three cases that *Shatzer* distinguishes — Hollister's "continued detention as [a] suspect[] rested with those controlling [his] interrogation," and he likewise "confronted the uncertainties of what final charges [he] would face, whether [he] would be convicted, and what sentence [he] would receive." *Id.* at 1225. In short, *Shatzer*'s description of the "paradigm *Edwards* case" applies with equal force to this case:

> That is a case in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated. After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, "thrust into" and isolated in an "unfamiliar," "police-dominated atmosphere," *Miranda*, 384 U.S., at 456-457, 86 S. Ct. 1602, where his captors "appear to control [his] fate," *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990).

*Id.* at 1220-21.

Indeed, save for the length of the interval between interrogations, the facts of this case are indistinguishable from *Edwards*, *Roberson*, and *Minnick*. In each of those cases, after the suspect initially invoked his right to counsel, he remained in pretrial custody until officers tried to re-interrogate him. *See Edwards*, 451 U.S. at 478-79 (after arrest and invocation of *Miranda* right to counsel, suspect was taken to county jail; officers re-interrogated him the next morning); *Roberson*, 486 U.S. at 678 (three days after arrest and invocation of *Miranda* right to counsel, a different officer interrogated the suspect about a different crime); *Minnick*, 498 U.S. at 148-49 (two days after suspect's arrest and invocation of *Miranda* right to counsel, officer re-interrogated him). And in each case, the Supreme Court held that the re-interrogation — coming after the suspect's invocation of his *Miranda* right to counsel and outside the presence of an attorney — violated the suspect's Fifth Amendment rights. *Edwards*, 451 U.S. at 484-85; *Roberson*, 486 U.S. at 677-79; *Minnick*, 498 U.S. at 156.

Given that the government does not dispute that both the October 19 and November 2 interviews were custodial interrogations within the meaning of *Miranda* and that Hollister was in pretrial custody during the entire interval between those interrogations, the Court can find no meaningful distinction between this case and *Edwards*, *Roberson*, or *Minnick*. It might be

possible to argue that, even without a break in custody, the *Edwards* presumption should cease to apply after a certain amount of time in pretrial detention; the Eighth Circuit seems to have suggested as much.[7] But the government has not made such an argument here. Moreover, even if the government had argued that the passage of time in pretrial detention alone rendered *Edwards* inapplicable, the Court would reject the argument under the circumstances of this case. Given that *Shatzer* requires a two-week break in custody to dissipate any lingering coercive effect, it would be inconsistent with *Shatzer* to find that a two-week interval between interrogations *without* a break in custody is likewise sufficient — particularly where, as here, the government has not presented any evidence concerning the conditions under which Hollister was held or the circumstances leading up to the November 2 interview.

The Court therefore concludes that, by reinitiating a custodial interrogation of Hollister outside the presence of counsel and after Hollister had already invoked his right to counsel during a previous custodial interrogation, police ran afoul of the Fifth Amendment as interpreted in *Edwards*. Hollister's November 2 statements must therefore be suppressed.

---

[7]*See Holman v. Kemna*, 212 F.3d 413, 419-20 (8th Cir. 2000) (2-1 decision); *United States v. Harris*, 221 F.3d 1048, 1052 (8th Cir. 2000) (noting that *Holman* suggested "that *Edwards* protection might be unavailable even to some suspects who *had* remained in continuous custody."). *But see Shatzer*, 130 S. Ct. at 1220 ("The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody" (citation and quotations omitted)); *id.* at 1222 ("The only logical endpoint of *Edwards* disability is termination of *Miranda* custody and any of its lingering effects."); *Minnick*, 498 U.S. at 153 (noting that the coercive effect of custody "may increase as custody is prolonged").

### B. *Defendant's Objections*

Hollister objects to Judge Leung's recommended denial of his motions to suppress (1) identifications of him that were obtained using photo lineups and surveillance photographs; (2) evidence obtained as a result of an October 17, 2011 traffic stop; (3) evidence obtained from the use of a tracking device placed on his van; (4) evidence obtained during the execution of several search warrants; and (5) evidence obtained as a result of his arrest. The Court considers each objection in turn.

#### 1. Photo Lineups and Surveillance Photographs

Hollister complains that the procedures used in the photo lineups were impermissibly suggestive and unreliable.[8] He further argues that his girlfriend's identification of him from a surveillance photograph was unduly suggestive because she had been told that he was the target of a robbery investigation. Having reviewed the evidence, however, the Court agrees with Judge Leung's well-reasoned analysis finding that the identification procedures were not unduly suggestive.[9] The Court also agrees with Judge Leung that, even if the photo lineups were

---

[8]The Court notes that there are some inconsistencies between the record and the parties' references concerning the dates on which some of the lineups occurred. In particular, in his motion Hollister refers to an October 14, 2011 lineup with witness N.T. *See* ECF No. 37. This lineup actually occurred on October 26, 2011. *See* Hr'g Tr. 15-17, 24-25.

[9]Hollister contends that Officer Matt Reilly, who conducted the October 26, 2011 lineup, gave inconsistent testimony concerning where he stood while the witness reviewed the lineup. A review of the transcript, however, demonstrates that Officer Reilly testified both on direct and on cross-examination that he stepped away while the witness reviewed the photographs. Hr'g Tr. 21, 33-34. In addition, Hollister places significance on the fact that Officer Reilly did not preserve the file folders that he used to present the photographs to the witness. The Court does not find this failure to be suspicious in the least. It is clear from Officer Reilly's testimony that the file folders were simply generic office supplies that he used multiple times for the same purpose until they became worn or dirty. Hr'g Tr. 20, 30-32. Officer Reilly's testimony about

(continued...)

impermissibly suggestive, the identifications are nevertheless admissible because they were reliable. *See Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir. 1984) ("Pared to its essence, the second inquiry is whether the identification is reliable.").

## 2. October 17, 2011 Traffic Stop

Hollister objects that the October 17, 2011 stop of his van was unlawful because, according to Hollister, there was no reason to believe that the driver or the van were involved in a crime. But the officer who stopped the van testified that he saw the van weave in and out of its lane, *see* Hr'g Tr. 90, which, as Judge Leung noted, is a violation of Minn. Stat. § 169.18, subd. 7(a). *Cf. State v. Richardson*, 622 N.W.2d 823, 826 (Minn. 2001) ("Even observing a motor vehicle weaving within its own lane in an erratic manner can justify an officer stopping a driver."). In addition, the van matched the description of a van that was involved in an armed robbery. Hr'g Tr. 90. Hollister objects that the officer only saw the van's headlights and therefore could not have stopped the van based on the description. But Hollister ignores the fact that the officer saw the van make a right turn, which gave the officer a view of the driver's side of the van. Hr'g Tr. 90-91. Hollister's objection to the traffic stop is therefore without merit.

## 3. Tracking Device

Hollister argues that any evidence obtained as a result of the use of a tracking device on his van must be suppressed. According to Hollister, discovery has revealed that a tracking device

---

[9](...continued)
his use of the folders, which the Court finds credible, is sufficient to demonstrate that he took measures to conduct a "blind" lineup. Hr'g Tr. 20-21. Moreover, it is unclear to the Court how the availability of the folders would help prove that Officer Reilly did or did not use them in the manner he described.

was placed on his van after the October 17, 2011 traffic stop.[10] There is no doubt that the placement of a tracking device on a vehicle constitutes a search for Fourth Amendment purposes. *See United States v. Jones*, 132 S. Ct. 945 (2012). The government did not obtain any evidence from the tracking device, however, and thus Hollister's motion to suppress such evidence is moot.

Even if the government had obtained such evidence, suppression would not be required. Hollister's van was impounded on October 17, 2011, and Hollister was arrested two days later, just after he picked up the van from the impound lot. Any tracking device must therefore have been placed on Hollister's van sometime in the short interval between when Hollister's van was impounded and when Hollister was arrested. In October 2011, then-binding Eighth Circuit precedent had established that the warrantless installation and monitoring of a tracking device for a reasonable period of time did not violate the Fourth Amendment. *See United States v. Marquez*, 605 F.3d 604, 609-10 (8th Cir. 2010). Officers had reasonable suspicion that Hollister's van was involved in armed robberies, and there is no suggestion that the tracking device was used for an unreasonably long period of time. Any evidence obtained through the tracking device would therefore not be subject to suppression. *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

---

[10]Judge Leung did not address this issue because the parties did not present any evidence that a tracking device was used. *See* R&R at 34.

4. Search Warrants

Hollister objects that the searches that were conducted pursuant to warrants were invalid because the affidavits submitted in support of the warrants failed to present sufficient evidence to support a finding of probable cause. In particular, Hollister argues that "[t]here is insufficient connection between Mr. Hollister and the places to be searched as relates to the dates the crimes occurred." ECF No. 60 at 7. This contention is without merit. The three search warrants at issue authorized searches of Hollister's van, four cell phones, a Brooklyn Center apartment, and a 2009 Mitsubishi Galant. *See* Gov't Exs. 1, 3, 4. As Judge Leung found, and as a review of the affidavits confirms, the facts recited in the affidavits provided ample probable cause to believe that Hollister had committed armed robberies and that evidence of these crimes would be found in the places and things to be searched.[11]

5. Arrest

Finally, Hollister argues that his October 19, 2011 arrest was unlawful because the photo lineups and video-surveillance identification were unduly suggestive and therefore did not provide probable cause. As discussed above, however, the identification procedures were not unduly suggestive and yielded reliable identifications. In addition, Hollister's arrest was based on more than just photo-lineup identifications.[12] Instead, Hollister's arrest was based on (1) multiple witness descriptions of the robber as a medium-built black male between 5'8" and

---

[11]Judge Leung also found that Hollister lacked a reasonable expectation of privacy in the Brooklyn Center apartment and in three of the four cell phones at issue. Even assuming that Hollister had a reasonable expectation of privacy, however, his challenge to the underlying affidavits is meritless.

[12]In fact, save for the October 19 lineup that was part of the basis of Hollister's arrest, most if not all of the lineups occurred after the arrest.

5'10" who was wearing a dark hooded sweatshirt and had a neck tattoo; (2) video surveillance of a person matching that description arriving and departing from the scene of one of the robberies in a distinctive van; (3) the October 17 traffic stop of the van, during which Hollister was identified as the driver; (4) officer surveillance of Hollister after he picked up the van from an impound lot; and (5) a witness's positive identification of Hollister from a photo lineup. Hr'g Tr. 107-14; *see also* Hr'g Tr. 60-66 (testimony describing photo lineup on which Hollister's arrest was based); Gov't Ex. 9 (photo lineup on which Hollister's arrest was based). In short, Hollister's challenge to the lawfulness of his arrest is without merit.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, the Court OVERRULES the parties' objections [ECF Nos. 58, 60] and ADOPTS the July 23, 2012 R&R [Docket No. 54]. Accordingly, IT IS HEREBY ORDERED THAT:

1. Defendant's motions to suppress eyewitness identifications [ECF Nos. 24, 37] are DENIED.

2. Defendant's motions to suppress evidence obtained as a result of search and seizure [ECF Nos. 19, 38] are GRANTED IN PART and DENIED IN PART as follows:

    a. The motions are GRANTED with respect to the contents of the four white plastic bags that were seized from L.M.'s house on October 19, 2011.

    b. The motions are DENIED in all other respects.

3. Defendant's motions to suppress statements, admissions, and answers [ECF Nos. 20, 39] are GRANTED IN PART and DENIED IN PART as follows:

a. The motions are GRANTED with respect to all statements made by defendant on October 19, 2011 after defendant invoked his right to counsel.

b. The motions are GRANTED with respect to all statements made by defendant on November 2, 2011.

c. The motions are DENIED in all other respects.

Dated: September 14, 2012

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge